IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

ACCOUNTING PRINCIPALS, INC., a )
Florida corporation, )
            )
         Plaintiff, )
            )
v. )  Case No. 07-CV-636-TCK-PJC
            )
MANPOWER, INC., a Wisconsin corporation;)
and INTERNATIONAL BUSINESS )
MACHINES CORPORATION, a New York )
Corporation, )
            )
         Defendants. )

## OPINION AND ORDER

This matter comes before the Court on the Motion to Compel of Plaintiff

Accounting Principals, Inc. ("API") [Dkt. No. 97] and the Motion for Protective Order of

Defendant International Business Machines, Inc. ("IBM") [Dkt. No. 94]. The matter has

been fully briefed and a hearing was held on July 13, 2009, therefore, the matter is now

ripe for decision.[1]

## I.
### Background

The background information has been compiled from the uncontested pleadings

and affidavits filed of record herein.

---

[1] At the hearing on July 13 the Court heard argument on nearly identical motions in this and a similar lawsuit. Pinstripe, Inc. d/b/a AcctKnowledge ("AK") has made similar allegations against IBM and Manpower as those asserted by API herein. *Pinstripe, Inc. d/b/a AcctKnowledge. v. Manpower, Inc. and International Business Machines Corporation*, Case No. 07-CV-620-GKF-PJC. Both this lawsuit and the AK lawsuit involve claims arising from the termination of business between IBM and AK and between IBM and API in October 2007.

API and AcctKnowledge ("AK") are full service staffing companies specializing in contract, contract-for-hire, and direct hire of accounting and finance professionals in the Tulsa market.  The companies recruit employees for accounting and finance positions for other companies.  The employees perform work on a contract basis for other companies but are employees of API or AK.  Both API (in 2003) and AK (in 2004) entered into agreements with IBM to provide contract employees for positions as requested by IBM.  These agreements were amended and extended several times by the parties.

In the instant action, API alleges that on October 22, 2007, IBM improperly terminated its relationship (the "2007 termination") and sought to transition contract work and employees from API to Defendant Manpower, Inc.  (IBM terminated its relationship with AK around the same time.)  API alleges that relevant to the 2007 termination is a separate 2005 dispute in which IBM terminated its business relationship with API (the "2005 dispute") and moved work and employees from API to AK.  After API complained to IBM about the matter, IBM conducted an in-house investigation, returned work to API and disciplined several IBM employees.  At issue in the pending motions are documents referred to by the parties as the "Ombudsman documents," so called because Eric D. Haft ("Haft"), IBM's Global Procurement Ombudsman, participated in parts of the IBM investigation(s) reflected therein.  The specific documents in question were identified by API in its motion to compel.  The documents at issue, identified by IBM's reference number used on its privilege log, are these:  1-17, 19-21, 23-26, 28, 31, 33-37, 39-46, 48-50, 55, 57-59, 61-67, 69-74, 76-96, 98-114, 116-121, 123-

2

127, 129, 131-134, 136, 139, 141-144, 146-158, 162-85, 187-89, 193-259, 261-64, 361-71, 508, 511-13, 515-17, 519, 525, 528, 530, 532-42, 548, 552, 557, 561-62, 566-68, 570-77, 580-82, 584-87, 591, 593, 598-600.[2]

In response to API's discovery seeking production of the Ombudsman documents, IBM produced a privilege log listing hundreds of documents for which attorney-client privilege or work-product protection was claimed.  For each document, the following information was provided:  Bates numbers, date of creation, author, recipient, copied recipients, description of document and privilege claimed.  AK seeks to compel production, arguing that the documents are neither privileged nor work-product protected.  In support of its privilege claims, IBM has submitted affidavits from Assistant General Counsel Douglas Vetter ("Vetter"), Ombudsman Haft and investigator Rebecca Belcher ("Belcher").  In essence the affidavits state that in March

---

[2]　　　These documents represent more than 1,500 pages of material.  Out of these pages, certain documents involve communications occurring before March 28, 2005 – before the API's complaint to IBM and before the Ombudsman had any involvement in the dispute.  The Court **DENIES** the motion to compel and **SUSTAINS** IBM's request for protective order as to the documents beginning with the following IBM Bates numbers:
BATES NO.  (Privilege log Reference number, where available)

| | | | |
|---|---|---|---|
| 012280 (508) | 014637 (536) | 016310 (568) | 017330 (587) |
| 012305 (511) | 014654 (537) | 016701 (570) | 017358 |
| 012312 (512) | 014658 (538) | 016733 (571) | 017390 (591) |
| 012318 (513) | 014662 (539) | 017140 (573) | 017410 (593) |
| 012354 (515) | 014664 (540) | 017204 (574) | 018297 (598) |
| 012360 (516) | 014687 (541) | 017215 (575) | 018321 (599) |
| 012364 (517) | 014700 (542) | 017228 (576) | 018339 (600) |
| 012389 (519) | 015132 (548) | 017237 (577) | 072000 |
| 012484 (525) | 015432 (552) | 017262 (580) | 07629 |
| 012519 (528) | 016197 (557) | 017269 (581) | 076282 |
| 013549 (530) | 016221 (561) | 017275 (582) | |
| 014604 (532) | 016241 (562) | 017309 (584) | |
| 014624 (534) | 016291 (566) | 017313 (585) | |
| 014631 (535) | 016304 (567) | 017317 (586) | |

2005 IBM undertook a legal investigation in anticipation of litigation prompted by API's claim of unfair treatment. According to IBM, API's complaint raised a "significant possibility" of litigation and questions about the conduct of certain IBM employees. Accordingly, Vetter requested that the investigation be conducted at his direction. Vetter states he directed the activities of Haft and Belcher to collect information so that Vetter could assess the situation and offer legal advice to IBM. Vetter told Belcher to identify any written communications and documents generated in the investigation as "privileged" and "prepared for counsel." IBM submitted the Ombudsman documents for *in camera* review on May 29, 2009. API has also submitted affidavits establishing that it understood the Ombudsman investigation was being conducted by an impartial, neutral for purposes of resolution without litigation.

## II.
### *Procedural History*

API filed suit in Tulsa County District Court on Nov. 1, 2007. On Nov. 5, 2007, Tulsa County District Judge Gordon McAllister denied API's request for a Temporary Restraining Order. The following day the case was removed to this Court. API filed its First Amended Complaint on Nov. 26, 2008. With one exception, API has asserted the same legal theories as asserted by AK: (1) Breach of contract (IBM); (2) Tortious interference with contractual relations (Manpower); (3) Tortious interference with prospective business relations (IBM and Manpower); (4) Unjust enrichment (Manpower). API has also asserted a negligence claim against IBM. [Dkt. No. 55].

API has moved to compel production of the Ombudsman documents and IBM has requested a Protective Order with respect to the same documents.  IBM contends that the documents and communications are protected by the attorney-client privilege and/or the work-product doctrine.

## III.
### Applicable Legal Principles

Rule 26(b)(1) provides that parties may obtain discovery "regarding any matter, not privileged, that is relevant to the claim or defense of any party…. "  Thus, to be discoverable under Rule 26, material must be both relevant to a party's claims or defenses and non-privileged.[3]

In analyzing privilege and work-product issues in a federal action, the starting point is Fed. R. Evid. 501 which states:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Thus, in a diversity case such as this attorney-client privilege issues are controlled by applicable state law while questions of work-product protection are controlled by federal law.  *Frontier Refining, Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 702 n.10 (10th Cir.

---

[3] Courts frequently refer to the "work-product privilege" although that designation is not accurate.  The work-product doctrine is not a privilege, but offers a qualified protection from discovery.  Nevertheless, the Court may occasionally herein refer to the "work-product privilege."

1998) (applying Wyoming law to privilege question and federal rules of evidence to work product issue).  Accordingly, the Court will apply Oklahoma law, 12 O.S. §2502, to the question of attorney-client privilege and federal law, Fed. R. Evid. 501 and applicable case law, to the work-product issues.

A. *Relevance*

Federal Rule of Civil Procedure 26 permits discovery of any material that is (1) relevant and (2) not privileged.  Fed. R. CIv. P. 26(b)(1).  To pass the initial hurdle for discovery, material must be "relevant to any party's claims or defenses."  *Id.*  However, relevancy is broadly construed at the discovery stage and a request for discovery should be considered relevant if there is "any possibility" that the information sought may be relevant to the claim or defense of any party.  *Owens v. Sprint/United Mgmt. Co.*, 221 F.R.D. 649, 652 (D.Kan. 2004)(citation omitted).  A discovery request should be allowed "unless it is clear that the information sought can have no possible bearing" on the claim or defense of a party.  *Id.* "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed.R.Civ.P. 26(b)(1).

When the requested discovery appears relevant, the party opposing discovery has the burden of establishing the lack of relevance by demonstrating that the requested discovery does not come within the scope of relevance set forth in Rule 26(b)(1), or that it is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure.  *Gen. Elec. Cap. Corp. v. Lear Corp.*, 215 F.R.D. 637, 640 (D.Kan. 2003) (citation omitted).

**B.** *Attorney-Client Privilege*

Material must be both relevant and non-privileged before it can be discoverable

under Rule 26.  If the Court finds that material passes the Rule 26 relevancy test, the

next analytic  task is to determine if the material is privileged or otherwise protected

from disclosure.

With respect to attorney-client privilege, Oklahoma law provides:

B. A client has a privilege to refuse to disclose and to prevent any other
person from disclosing confidential communications made for the
purpose of facilitating the rendition of professional legal services to the
client:

1. Between the client or a representative of the client and the client's
attorney or a representative of the attorney;

2. Between the attorney and a representative of the attorney;

3. By the client or a representative of the client or the client's attorney or a
representative of the attorney to an attorney or a representative of an
attorney representing another party in a pending action and concerning a
matter of common interest therein;

4. Between representatives of the client or between the client and a
representative of the client; or

5. Among attorneys and their representatives representing the same client.

12 O.S. §2502.

The party asserting attorney-client privilege or work-product protection has the

burden of showing clearly that either or both apply.  *Barclays-American Corporation v.*

*Kane*, 746 F.2d 653, 656 (10th Cir. 1984);  *Peat, Marwick, Mitchell & Co. v. West*, 748 F.2d

540, 542 (10th Cir. 1984); *Sanchez v. Matta*, 229 F.R.D. 649, 654 (D.N.M. 2004).  IBM must

show how each document satisfies all elements of the privilege.  *SEC v. Microtune, Inc.*, -

-- F.R.D. ---, 2009 WL 1574872at  *3 (N.D.Tex. June 4, 2009).  A general assertion of

privilege is insufficient.  *Id.*  Here, with respect to each document Defendant must show

(1) a confidential communication; (2) between privileged persons; (3) made to assist in

securing legal advice or assistance for the client.

### C.  *Work Product*

Work product analysis starts with Rule 26 of the Federal Rules of Civil

Procedure:

> (3) Trial Preparation: Materials. Subject to the provisions of subdivision
> (b)(4) of this rule, a party may obtain discovery of documents and tangible
> things otherwise discoverable under subdivision (b)(1) of this rule and
> prepared in anticipation of litigation or for trial by or for another party or
> by or for that other party's representative (including the other party's
> attorney, consultant, surety, indemnitor, insurer, or agent) only upon a
> showing that the party seeking discovery has substantial need of the
> materials in the preparation of the party's case and that the party is unable
> without undue hardship to obtain the substantial equivalent of the
> materials by other means. In ordering discovery of such materials when
> the required showing has been made, the court shall protect against
> disclosure of the mental impressions, conclusions, opinions, or legal
> theories of an attorney or other representative of a party concerning the
> litigation.

Fed. R. Civ. P. 26(b)(3).

Rule 26(b)(3) does not limit work-product protection only to the work of lawyers.

It includes consultants, insurers and others.  Under the current version of the Rule,

whether a document is protected as work product depends on the motivation behind its

preparation, rather than who prepared it.  Edna Selan Epstein, *The Attorney Client*

*Privilege and the Work-Product Doctrine*, vol. II, p. 916 (ABA 5th ed.) (hereafter, "Epstein").

Nevertheless, practical problems can arise when materials have been gathered or

prepared by non-lawyers.  *Id.* at 917.   Whether the non-lawyers consulted with attorneys may be relevant to whether there was anticipation of litigation.  *APL Corp. v. Aetna Casualty & Sur. Co.*, 91 F.R.D. 10, 16 (D.Md. 1980).  Some courts have held that absence of an attorney's participation in preparing a document may give rise to a presumption that the work was done in the ordinary course of business and not in anticipation of litigation.  *Thomas Organ Co. v. Jadranska Slobodna Plovidba*, 54 F.R.D. 367, 372 (N.D.Ill. 1972).

The proponent of work-product protection must make a clear showing that it applies.  *Peat, Marwick*, 748 F.2d at 542; *Sanchez*, 229 F.R.D. at 654.  Establishing work-product protection often depends on a showing that there was a reasonable threat of litigation and that the motivation for creating the document(s) in question was that threat.  Epstein, *supra* at p. 825.  Courts sometimes address this last issue in terms of a party's "primary motivation" for creating documents. *See Sanche*, 229 F.R.D. at 655 ("Litigation need not necessarily be imminent as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation."); *Janicker v. George Washington University*, 94 F.R.D. 648, 650 (D.D.C. 1982) (the "primary motivating purpose behind the creation of a document or investigative report must be to aid in possible future litigation.")  Epstein, at p. 854.  A key inquiry is whether the documents would have been created "*regardless* of whether litigation was in the offing." Epstein at p. 855 (emphasis added).

# IV.
## *Discussion*

### A.  The 2005 Dispute Between API and IBM[4]

In 2005, API and AK were the only two vendors providing accounting contract

employees to IBM in the Tulsa market; API had the lion's share of the IBM Business.

IBM approached API early in March 2005 about ways to reduce costs in the Tulsa BTO

program.[5]   IBM wanted to reduce its costs by 5 percent.  API suggested some cost-

cutting measures such as reducing overtime and cutting employees.  At a meeting on

March 7, 2005, IBM indicated specific concern over its First Quarter 2005 earnings and

wanted suggestions from API on cutting First Quarter expenses.   During a conference

call between API and IBM employees on March 8, IBM proposed that API rebate

$180,000 in charges for the First Quarter and reduce charges to IBM by 5 percent going

forward.  IBM said API could recover $100,000 of the rebated amount in the Second

Quarter by billing for "consulting services."  IBM told API that IBM needed a quick

acceptance of the proposal or it would approach its other vendor, AK.

On March 9, API told IBM it had ethical and legal concerns over IBM's proposal

and could not accept it.  In addition to API's financial concern over further reducing its

charges to IBM, it was also concerned over whether the proposal complied with

---

[4]      The facts set forth in this section are derived from the uncontested allegations in the Complaint
and the Affidavits of the following AP people:  Lynn Flinn, AP Regional Vice President of the Central
Region; Kimberly Nation, Managing Director of AP's Tulsa Branch; Elaine Armenio, AP Account
Executive in Tulsa [all attached as Exhibits to API's Motion to Compel [Dkt. Nos. 97-99].  The facts are
also developed from the Affidavits of the following IBM people: Douglas G. Vetter, Assistant General
Counsel; Rebecca Belcher, member of Corporate Investigations team; Eric D. Haft, ombudsman to Global
Procurement Ombudsman's office [attached as Exhibits 1-3 to IBM's Motion for Protective Order [Dkt.
No. 104].  In addition, the documents in dispute were submitted for *in camera* review.
[5]      BTO or business transformation outsourcing is an IBM program involving outsourcing of non-core
business activities.  The Tulsa BTO program, used contract accounting and financial employees in the Tulsa market.

Financial Accounting Standards Board ("FASB") requirements, Generally Accepted Accounting Principles ("GAAP") and the provisions of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (2002) (codified in various sections of Titles 11, 15, 18, 28 & 29 of the United States Code).  API managers felt that IBM was proposing an improper manipulation of corporate earnings and that the suggested $100,000 consulting fee was a sham.

IBM informed API in mid-March that it was terminating their relationship and moving all of the Tulsa business to AK.  IBM wanted API to inform its employees that if they wanted to continue their work for IBM they would have to leave API and become employees of AK.

### B.  IBM's Investigation and the Role of the Ombudsman

Unhappy with IBM's conduct, API sought an avenue to register a complaint. API learned of a Hotline telephone number through IBM's website, and on or about March 29, 2005, API called the Hotline number.  A member of IBM's legal staff returned the call and said that since API's dispute with IBM was not in litigation, the company should contact IBM's Procurement Ombudsman to discuss the problem.[6]  On April 1, 2005, API had a conversation with Ombudsman Haft about the dispute and Haft made plans to travel to Tulsa to interview API personnel about the matter.

---

[6]     IBM's website states:
    The purpose of the Ombudsman Office is to provide an avenue for suppliers and others to address procurement-related concerns and issues that, for any reason, cannot be resolved satisfactorily through normal business channels.  As an objective and impartial organization, the Ombudsman assists in resolving procurement-related concerns and issues.  The intent of the Ombudsman Process is to foster more open, effective, and productive relationships with our suppliers.

http://www-03.ibm.com/procurement/proweb.nsf/ContentDocsByTitle/United+States~Ombudsman-Supplier+relations.  (Accessed July 13, 2009).

Generally, an ombudsman works outside of normal line management structures and directly to upper management.  An ombudsman is not an advocate for the complainant, nor is his role to defend the corporation he works for.  His role is that of an impartial neutral, seeking the best resolution of the dispute.  *Eg.*, American Bar Association's Standards for the Establishment and Operation of Ombudsman Offices (adopted July 2000).

According to IBM, sometime after API's call Vetter requested that the IBM investigation(s) be conducted at his direction.[7]  Vetter directed Haft and investigator Belcher to collect information regarding API's claim and report it to him.  Vetter directed Haft and Belcher on how to conduct the investigation and what information he needed.  Haft and Belcher were instructed to mark any documents generated in connection with the investigation as "Privileged."

On April 5, Haft and Belcher traveled to Tulsa and interviewed API employees about the dispute:  Lynn Flinn, an API Regional Vice President; Kimberly Nation, Managing Director of API's Tulsa office; and, Elaine Amenio, Tulsa Account Executive.  Haft represented himself to be IBM's Ombudsman.  After the API interviews, Haft and Belcher spent the next two weeks interviewing IBM personnel involved in the 2005 dispute and reported their findings to IBM's Office of General Counsel.  A confidential internal report was prepared for IBM's Legal Counsel and was circulated to select IBM

---

[7]       IBM's investigation was initiated on two fronts: one by the IBM Ombudsman and one by corporate legal in anticipation of litigation.  It appears that IBM's legal office co-opted the Ombudsman investigation because IBM now claims that the impartial and neutral Ombudsman was actually working as part of IBM's legal defense team in preparation for litigation.

managers.  In July 2005, IBM reversed its decision to transition work from API to AK and restored API to its pre-March 2005 status.  IBM also disciplined several of its employees in connection with the cost reduction demand made on API.

### C.   Attorney-Client Privilege, Attorney Work Product

The Court previously ruled that because API contends the 2007 termination was retaliation for API's complaint regarding the 2005 dispute, the 2005 dispute is relevant to the claims herein.  Therefore, I will proceed to IBM's contention that the Ombudsman documents are privileged and/or work product.

### (1) Haft's and Belcher's non-lawyer status does not preclude application of the privilege or work-product protection.

API has argued that attorney-client privilege and work-product protection are not applicable to the Ombudsman documents because Haft and Belcher are not attorneys.  However, under proper circumstances, the Oklahoma privilege statute extends protection to confidential communications with a "representative of the attorney."  12 O.S. §2502(B).  By the same token, Haft's and Belcher's non-lawyer status does not, without more, preclude their work from qualifying as attorney work product. The work-product doctrine has been extended to material prepared by an agent for an attorney.  *U.S. v. Nobles*, 422 U.S. 225, 238-39 (1975); *Alexander v. F.B.I.*, 192 F.R.D. 12, 18 (D.D.C. 2000); *Sanchez*, 229 F.R.D. at 654-55.  Under the current version of Fed. R. Civ. P. 26(b)(3), "whether a document is protected as work product depends on the motivation behind its preparation, rather than on the person who prepared it."  Epstein at 916.

It has been suggested that an Ombudsman by definition cannot be an agent of an attorney because the Ombudsman must remain impartial and neutral.  IBM argues that the Ombudsman can wear two hats and is akin to the "Special Officer" described in *In re LTV Securities Litigation*, 89 F.R.D. 595 (N.D. Tex. 1981).

(2) **Work Product**

Work product protection applies to (a) documents or tangible things, (b) otherwise discoverable, (c) prepared in anticipation of litigation, (d) by or for another party or that party's representative.  *Hickman v. Taylor*, 329 U.S. 495 (1947).  The key issue here is whether the Ombudsman documents were prepared in anticipation of litigation.  API takes the position that the Ombudsman's involvement in the investigation in essence constitutes a waiver of work-product protection because confidential litigation documents/communications cannot be shared with an independent, impartial person whose goal is to avoid litigation.  IBM, on the other hand, argues there is no reason why an Ombudsman cannot wear two hats – one as the impartial, objective Ombudsman seeking to resolve a business dispute, and one as an investigator taking direction from legal counsel, helping to clarify the company's litigation strategy.  No case authority specific to an Ombudsman has been provided to the Court.  IBM relies heavily on drawing an analogy to the "Special Officer" described in *LTV*.  However, the Special Officer in *LTV* is not analogous to the Ombudsman in the instant case.  The Special Officer was an attorney hired by LTV to implement an SEC Consent Decree and report to LTV's audit committee.  The Special Officer was a unique office created specifically for purposes of resolving LTV's securities litigation.  Here, the

14

Ombudsman is a position and office created by IBM to handle business disputes on an on-going basis.  The office functions as a part of IBM's normal business structure and in the ordinary course of IBM's business.  In *LTV*, communications with the Special Officer were primarily for litigation purposes; however, that is not the case in this action with communications with the Ombudsman.

I render no opinion as to whether disclosure of confidential information to an Ombudsman constitutes a *per se* waiver of privilege.  However, the Ombudsman's involvement in IBM's investigation is problematic because it confuses the purpose of IBM's inquiry.  IBM must establish that documents involving the Ombudsman were created primarily for litigation purposes.  The Ombudsman's involvement indicates a separate business purpose was the motivation.  It is clear that "dual purpose" documents may not qualify for work-product protection.  Documents will receive work product protection only if one of the purposes for creating the document is litigation motivated, "provided that the documents would not have been prepared in substantially identical form even had there been no litigation purpose."  Epstein at 885-86.  Where documents are created or information is acquired for business purposes other than litigation, the documents or information may not be protected.  Epstein at 887.  If there is a business purpose separate and apart from litigation that caused the documents to be created, work product protection will not apply.  *See, for example,* *Willis v. Westin Hotel Co.*, 1987 WL 6155 at *1 (S.D.N.Y. Jan. 30, 1987) ("[M]aterial prepared by non-attorneys in anticipation of litigation, such as accident reports and other investigative reports, is immune from discovery only where the material is

15

prepared exclusively and in specific response to imminent litigation."); *Whitman v. United States*, 108 F.R.D. 5, 8-9 (D.N.H. 1985) (work product protection did not apply to a hospital peer review report since the primary purpose was not in anticipation of litigation.); *Hensel Phelps Constr. Co. v. Southwestern Roofing & Sheet Metal Co.*, 1980 WL 318090 (D.Colo. April 25, 1980) (work product protection did not apply to documents whose primary purpose was to determine how a roof could be repaired, even though litigation was under consideration or had been filed at the time the documents were created.)

In this instance, IBM's investigation began with a call to the Ombudsman seeking to resolve a business dispute.  The Ombudsman's work is part of IBM's routine business practice and is not undertaken to prepare for litigation.  The test for work-product protection turns on the *primary purpose* for which the documents were created.   As the advocate of work product protection, IBM has the burden of establishing that the primary purpose for the Ombudsman documents was anticipation of litigation.  "The court looks to the primary motivating purpose behind the creation of the document to determine whether it constitutes work product."  *Marten v. Yellow Freight System, Inc.*, 1998 WL 13244 at *10 (D.Kan. Jan. 6, 1998) (quoting *EEOC v. GMC,* 1988 WL 170448, at *2 (D.Kan. Aug.23, 1988)). "Materials assembled in the ordinary course of business or for other non-litigation purposes are not protected by the work product doctrine. The inchoate possibility, or even likely chance of litigation, does not give rise to work product." *Ledgin v. Blue Cross & Blue Shield,* 166 F.R.D. 496, 498 (D.Kan.1996) (citations omitted).

Here, the record evidence shows that the documents in question were created in the ordinary course of business and for independent business reasons.  This investigation would have occurred – and at least some of the Ombudsman documents would have been created – even if there had been no threat of litigation.  Thus, IBM has failed to show that the primary motivation for creating the Ombudsman documents was preparation for litigation.  This conclusion is consistent with indicia of primary motivation.  For example, courts may be persuaded that documents are work-product where witnesses are advised up front that their interviews are being conducted for an attorney because litigation is possible, or if summaries of witness interviews offer opinions on the witness's credibility.  *See Gator Marshbuggy Excavator L.L.C. v. M/V Rambler*, 2004 WL 1822843 at *3 (E.D.La. Aug. 12, 2004).  There is no evidence the API or IBM witnesses were told of possible litigation.  Indeed, API was advised to contact the Ombudsman because the 2005 dispute was *not* a litigation matter, and when Haft arrived in Tulsa he represented that he was there as an Ombudsman, not a representative of the legal department.  Furthermore, the witness summaries I have reviewed *in camera* offer no opinions of witnesses' credibility. Based on all of the foregoing, I conclude that the Ombudsman documents were not prepared primarily in anticipation of litigation and are, therefore, not work-product protected.

**(3) Attorney Client Privilege.**

Because discovery under Rule 26 extends only to matters that are relevant and non-privileged, the Ombudsman documents are not discoverable if they fall within the coverage of the attorney-client privilege.

Analysis of IBM's attorney-client privilege claim is made difficult by the fact that the only attempt to address each specific document at issue is the short description contained on IBM's privilege log.  In general, this is simply not sufficient to meet IBM's burden.  For example, it is obvious that for the privilege to attach there must first be a communication.  Yet many of the entries on the privilege log do not indicate that there was any communication of the document to anyone.  (On the first page of the log, no recipients are shown for any document.)  Document No. 2, authored by Rebecca Belcher, is described as "interview notes with Lynn Flinn prepared on behalf of legal counsel."  The privilege log does not indicate that these notes were ever communicated to anyone at IBM for the purpose of securing legal advice for the company.  In addition, if IBM contends that the communication to Belcher by Flinn is protected by attorney-client privilege, this contention is fatally flawed: Flinn could not have been seeking legal advice from Belcher because Flinn was a Vice President with API, she was not an IBM employee, and, furthermore, Belcher is not a lawyer.

In some cases, the author of the document for which privilege is claimed is not even an IBM employee.  According to IBM's privilege log, Doc. No. 155 was authored by Kimberly Nation of API.  Clearly, this document cannot be attorney-client or work-product protected.

18

IBM has asserted attorney-client privilege and work product on Document No. 167.  But according to the privilege log, the author of this document is API's Flinn, not IBM or IBM's attorney.  Furthermore, the underlying document is IBM's publicly available Business Conduct Guidelines.  These is hardly a confidential communication since the Guidelines are posted on IBM's website.  Additionally, although the document contains hand-written comments, these appear to be Flinn's comments advocating for API.  Clearly, neither attorney-client privilege nor work-product protection could apply to this document.   The citation to these documents is only meant to be representative of some of the problems with IBM's privilege/work-product claims.

IBM's attorney-client privilege claim is haunted by the same problem its work-product claims face:  Many of the Ombudsman documents do not appear to contain communications seeking legal advice or made for the primary purpose of seeking legal advice.  *See First Chicago Int'l v. United Exchange Co.*, 125 F.R.D. 55, 57 (S.D.N.Y. 1989) (Party claiming privilege must show that "but for" the need for legal advice the communication would not have occurred.).

After extensive review of the documents, I conclude that IBM has failed to establish that most of these documents are attorney-client confidential communication in furtherance of legal advice.

There are, however, some documents that the Court finds do fall within the asserted protection.  IBM Doc. No. 2 is a summary of interviews with various individuals.  Within this document are specific references to comments and thoughts of Assistant General Counsel Vetter that the Court finds should be redacted before

production.  In addition, the Court finds that the following documents qualify for attorney-client privilege:

Reference No. 15, 40, 46, 63, 65, 114, 121, 123, 124, 132, 133, 136, 141, 143, 184, 194, 195, 207, 210, 215, 216 (page 001115), 218, 221, 224, 225, 233, 234, 246, 247, 249, 251, 253, 254, 255, 256.  Therefore, the Motion to compel is **DENIED** and the motion for protective order **GRANTED** with respect to these documents.

## V.
## Summary

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** the Motion to Compel [Dkt. No. 97] and Motion for Protective Order [Dkt. No. 94].  Specifically, the Court orders as follows:

1.   The motion to compel is DENIED and the motion for protective order GRANTED as to the documents described in footnote 2, *supra.*

2.   Documents designated by Reference Numbers 15, 40, 46, 63, 65, 114, 121, 123, 124, 132, 133, 136, 141, 143, 184, 194, 195, 207, 210, 215, 216 (page 001115), 218, 221, 224, 225, 233, 234, 246, 247, 249, 251, 253, 254, 255, 256 are attorney-client privileged.  The motion to compel as to these documents is DENIED; motion for protective order GRANTED.

3.   The remaining documents 1-14, 16-17, 19-21, 23-26, 28, 31, 33-37, 39, 41-45, 48-50, 55, 57-59, 61-62, 64, 66-67, 69-74, 76-96, 98-113, 116-120, 125-127, 129-131, 133-134, 139, 142, 144, 146-158, 162-183, 185, 187-89, 193, 196-206, 208-209, 211-215, 217, 219-220, 222, 223, 226-232, 235-245, 248, 250, 252, 257-259, 261-64, 361-

71, 533, are neither privileged nor work-product protected and shall be

produced within 10 days of this Opinion and Order.  (Specific opinions of

Assistant General Counsel Vetter may be redacted from Doc. No. 2).

IT IS SO ORDERED this 28th day of July 2009.

Paul J. Cleary
United States Magistrate Judge